IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-01150-PAB-CBS

RICHARD S. MCINTOSH,
      Plaintiff
v.

HARLEY G. LAPPIN, individually and in his official capacity as Director;
JOYCE CONLEY, individually and in her official capacity as Assistant Director;
MICHAEL K. NALLEY, individually and in his official capacity as Regional Director;
RONNIE WILEY, individually and in his official capacity as Warden;
BLAKE R. DAVIS, individually and in his official capacity as Warden;
SARA M. REVELL, individually and in her official capacity as Warden;
W.A. SHERROD, individually and in his official capacity as Warden;
RUSSELL RAY, individually and in his official capacity as Associate Warden;
KEVIN MURPHY, individually and in his official capacity as Associate Warden;
MS. NELSON, individually and in her official capacity as Associate Warden;
E.A. STEPP, individually and in his official capacity as Warden;
MR. SPROUL, individually and in his official capacity as Unit Manager;
BUDDY ADELSBERGER, individually and in his official capacity as Unit Manager;
MS. CARNEY, individually and in her official capacity as Unit Manager;
MS. FLUCK, individually and in her official capacity as Case Manager;
GERALD BOZMAN, individually and in his official capacity as Case Manager;
RANDY DAVIS, individually and in his official capacity as Warden
MARTA SANTIAGO, individually and in her official capacity as Case Manager;
MS. KRIST, individually and in her official capacity as S.I.A.;
MR. KRIST, individually and in his official capacity as Captain;
JOHN VANYUR, individually and in his official capacity as Assistant Director; and
OTHER PARTIES, Names Unknown, individually and in their official capacities relating to
a "Validation" Process,
      Defendants.

---

**RECOMMENDATION OF MAGISTRATE JUDGE REGARDING
PENDING MOTIONS TO DISMISS**

---

Magistrate Judge Shaffer

      Pending before this court are the "Official Capacity Defendants' Motion to Dismiss"

(doc. #66) filed on October 20, 2011, and the "Individual Capacity Defendants' Motion to Dismiss"[1] (doc. #105), filed on January 23, 2012.  Briefing on these motions is complete in the wake of the response briefs (doc. #82 and #114) filed by Plaintiff McIntosh on December 1, 2011 and February 16, 2012, the reply briefs (doc. #84 and #121) filed by Defendants on December 5, 2011 and March 15, 2012, the "Response to BOP's 'Reply in Support of Official Capacity Motion to Dismiss'" (doc. #89) filed by Plaintiff McIntosh on December 14, 2011, Defendants' Notice of Supplemental Authority (doc. #126) filed on May 11, 2012, and Plaintiff McIntosh's Reply to "Defendants Notice of Supplemental Authority (doc. #127) filed on May 17, 2012. Pursuant to the Order of Reference dated July 7, 2011 (doc. #12) and separate memoranda dated October 20, 2011 and January 23, 2012, the instant motions were referred to the Magistrate Judge.  The court has reviewed the parties' briefs and exhibits,[2] the pleadings, the entire case file, and the applicable law, and is sufficiently advised in the premises.  For the following reasons, I am recommending that Defendants' motions be granted.

## PROCEDURAL BACKGROUND

This case was commenced by the *pro se* Plaintiff, Richard McIntosh, on April 29, 2011 with the filing of a 51-page Complaint.  Throughout the pendency of this action, Mr. McIntosh has been incarcerated at the United States Penitentiary, Administrative Maximum ("ADX") in Florence, Colorado.  Since May 3, 2011, Plaintiff has been classified as a "General Population" inmate.

---

[1]Filed on behalf of all Defendants save for E.A. Stepp, whose summons was returned as un-executed.

[2]The parties' submissions total 278 pages.

Mr. McIntosh first entered the custody of the Federal Bureau of Prisons ("BOP") in 1985 and currently is serving a 34-year sentence for the offenses of bank robbery, possession of a firearm following a felony conviction, use of a firearm during the commission of a crime, and conspiracy.  Plaintiff's projected release date is October 9, 2021.  Following a 1991 conviction, Mr. McIntosh initially was incarcerated in the United States Penitentiary, Terre Haute, Indiana, but was transferred to the United States Penitentiary, Lewisburg, Pennsylvania in 1993.  On May 23, 1995, Mr. McIntosh was re-assigned to the United States Penitentiary, Marion, Illinois ("USP-Marion").  On May 19, 1999, Plaintiff, with the assistance of another prisoner, allegedly stabbed inmate Terry Walker to death.  Based upon that incident, in June 2000, Mr. McIntosh was recommended for placement in the USP Marion control unit.  On June 28, 2000, the USP-Marion control unit team determined that Mr. McIntosh's placement would continue for 60 months, which Plaintiff contends should have made him eligible for release from the control unit in August 2005.  *See* Complaint (doc. # 1), at ¶ 9.  Mr. McIntosh was transferred to the ADX control unit on July 28, 2000.

The Bureau of Prisons established the control unit program "to place into a separate unit those inmates who are unable to function in a less restrictive environment without being a threat to others or to the orderly operation of the institution."  *See* 28 C.F.R. § 541.40.  *See also* 49 FR 32990-01, 1984 WL 115350 (August 17, 1984).  The Bureau of Prisons Program Statement for the control unit program attached to the Official Capacity Defendants' Motion to Dismiss states, in pertinent part, that an inmate assigned to a control unit must be provided with "[n]otice of the projected duration of the inmate's confinement in a control unit."  *See* Exhibit A, Attachment 3 (doc. #66-1, page 51 of 109), to Official Capacity Defendants' Motion to Dismiss.

3

(1) Staff must notify an inmate upon admission to a control unit of his or her "unit status" (projected duration of confinement in the control unit).  In determining this, staff must give primary consideration to the nature of the act(s) that resulted in the control unit placement.  Another factor to consider is the inmate's behavior while in administrative detention pending actual placement.

* * *

(3) An inmate's unit status may range from one month to any definite number of months.  The unit team may increase or decrease unit status, once assigned, provided this is documented and dependent on behavior while assigned to the unit.  This includes behavior while the inmate is classified as a control unit inmate, even though the inmate is out of the unit on writ, holdover status, etc.

*Id.*  The current ADX Institution Supplement, adopted "to provide local guidance for implementation of the Federal Prison Systems Program Statement on Control Unit Programs," states that "Control Unit Inmates who leave ADX Florence for Writ of Habeas Corpus for testimony or for prosecution will only receive Control Unit credit for the month in which they depart.  For the remainder of the writ, the inmate will not receive Control Unit Credit."  *See* Exhibit A, Attachment 9 (doc. #66-1, page 96 of 109), to Official Capacity Defendants' Motion to Dismiss.  Only the Executive Panel[3] may release an inmate from a control unit based upon an evaluation of several factors set forth in 28 C.F.R. § 541.50.

Bureau of Prisons regulations also provide that:

(a)  Once every 30 days, the control unit team, comprised of the control unit manager and other members designated by the Warden . . . shall meet with an inmate in the control unit.  The inmate is required to attend the team meeting in order to be eligible for the previous month's stay in the control unit to be credited towards the projected duration of confinement in that unit.  The unit team shall make an assessment of the inmate's progress within the unit and may make a recommendation as to readiness for release . . . .

---

[3]"The Executive Panel is composed of the Regional Director of the region where a control unit is located to which referral is being considered and the Assistant Director, Correctional Programs Division."  28 C.F.R. § 541.45.

4

(b) The Warden shall serve as the review authority at the institutional level for unit team actions.

(c)  An inmate may appeal the Warden's decision to the Executive Panel within five working days of receipt of that decision. . . .

(d) At least once every 60 to 90 days, the Executive Panel shall review the status of an inmate in a control unit to determine the inmate's readiness for release from the Unit. . . .

(e) An inmate may appeal a decision of the Executive Panel, through the Administrative Remedy Procedure, directly to the Office of General Counsel, Bureau of Prisons within 30 calendar days from the date of the Executive Panel's response.

28 C.F.R. § 541.49.

Mr. McIntosh concedes that after being transferred to ADX, he received monthly reviews and 90-day Executive Panel reviews during the period from September 2000 to May 2003.  *See* Complaint, at ¶ 10.  However, on or about May 30, 2003, Mr. McIntosh was transferred to USP-Marion in order to stand trial on charges pending in the United States District Court for the District of Southern Illinois.  *Id.* at ¶ 12.  Plaintiff alleges that he was held in control unit status at USP-Marion for much of the period from May 30, 2003 to September 14, 2006.[4]

Believing that his 60-month control unit sentence expired in August 2005, "Plaintiff asked Defendant Adelsberger [his Unit Manager at USP-Marion]  to be released from control unit status."  (Complaint ¶ 20).  As alleged in the Complaint,

21.     Mr. Adelberger told McIntosh "I will check into it."

---

[4]There appears to be some disagreement as to when Mr. McIntosh was transferred from USP-Marion.  The Official Capacity Defendants have provided a Declaration from Dan Sproul (doc. #66-1), at ¶ 20, which states that Plaintiff was transferred from USP-Marion to the Federal Correctional Institution, Greenville, Illinois on September 16, 2004.  However, the SENTRY Inmate History, Admissions and Releases, cited in the Sproul Declaration as Attachment 2, as well as Attachment 11 to the same Declaration, seems to corroborate Mr. McIntosh's chronology.

22.     McIntosh has obtained, through the Freedom of Information Act (FOIA) e-mails between the ADX control unit and Mr. Adelsberger that confirm Mr. Adelsberger "checked into it."

23.     The e-mails state that McIntosh will remain on control unit status for the duration of the writ, "upon completion of his writ, he will return to the control unit (ADX) and appear before the very next executive panel for review."

24.     Also obtained through FOIA, McIntosh has a document signed by Warden Randy Davis concurring with the e-mails but also adding that Marion staff will now conduct the mandatory monthly reviews.

*Id.* at ¶¶ 22-24.[5]

Although Mr. McIntosh contends that Warden Stepp said he would receive credit for time spent in the USP-Marion control unit, Plaintiff alleges that he was not given required monthly reviews during the period from June 2003 to August 2005, and was not given Executive Panel reviews between June 2003 and September 14, 2006.[6]  *Id.* at ¶¶ 16 and 18.  The Complaint alleges that the "Marion Defendants gave Plaintiff a monthly review for September 2005 [and] . . . credited one month toward the completion of the 60 month sentence."  *Id.* at ¶¶ 25 and 26.  "In October 2005 the Defendants offered McIntosh a monthly review, [but] McIntosh refused to attend and was thus not credited with one month."  *Id.* at ¶ 27 (emphasis in original).  Plaintiff claims that he did not receive monthly reviews between November 2005 and his transfer from

---

[5]Mr. McIntosh attached to his "Opposing Motion to Doc. 66," as Exhibit B (doc. #82, page 35 of 90), a series of e-mails between Defendant Adelsberger and Tommy Gomez, the control unit manager at ADX, which appear to corroborate these allegations.  Notably, in his October 12, 2005 e-mail to Mr. Gomez, Defendant Adelberger indicates that he "will let [Mr. McIntosh] know" that he "needs to remain in Control Unit status" until he returns to ADX and appears "before the very next Executive Review Panel for release."

[6]Plaintiff asserts that during the relevant period, the USP Marion control unit team included Defendants Stepp, R. Davis, Rau, Adelsberger and Bozman, while Defendant Vanyur and Nalley were in charge of Executive Panel reviews.  *See* Complaint, at ¶¶ 14 and 15.

USP-Marion on September 14, 2006.  *Id.* at ¶ 28.

The Complaint alleges that on September 14, 2006, Mr. McIntosh was transferred from USP-Marion to the control unit at the Federal Correctional Institution Greenville ("FCI-Greenville"), Illinois, where he remained until June 2008.  The control unit team at FCI-Greenville[7] purportedly conducted, and Mr. McIntosh attended, monthly reviews in September, October and November 2006.  However, Plaintiff alleges that those monthly reviews were not credited against his 60-month control unit classification.  *Id.* at ¶ 40.  Mr. McIntosh denies that he received any monthly reviews while at FCI-Greenville between December 2006 and July 2008.  *Id.* at ¶ 41.  Plaintiff further alleges that Defendants Vanyur, Nalley and Conley never conducted any Executive Panel reviews while he was incarcerated at FCI-Greenville.  *Id.* at ¶ 44.

In June 2008, Mr. McIntosh was transferred from FCI-Greenville to the Metropolitan Correctional Center, Los Angeles, California and arrived at that facility on July 22, 2008.  Mr. McIntosh was returned to ADX in November 2008.  The Complaint alleges that Plaintiff did not receive any monthly or Executive Panel reviews between July and November 2008.  *Id.* at ¶ 49.  During the monthly review conducted by the ADX control unit team[8] in December 2008, Plaintiff allegedly was told that "he must serve 28 more months in the ADX Control Unit."  *Id.* at ¶ 54.  According to Mr. McIntosh, he "explained that he was on Control Unit status for the

---

[7]Plaintiff asserts that during the relevant period, the FCI Greenville control unit team included Defendants Revell, Sherrod, Murphy, Nelson, Carney and Santiago, while Defendant Vanyur, Nalley and Conley were members of the Executive Panel.  *See* Complaint, at ¶¶ 36 and 37.

[8]The Complaint alleges that during the relevant period, the ADX control unit team included Defendants Wiley, B Davis, Sproul, and Fluck, while Defendants Conley and Nalley were responsible for Executive Panel reviews.  *See* Complaint, at ¶¶ 52 and 53.

duration of the writ, and that he was supposed to go before the next available Executive Panel for release.  ADX Defendants told McIntosh if he could prove his claims the ADX Defendants would reconsider the 28 months."  *Id.* at ¶¶ 55 and 56.  Mr. McIntosh alleges that the Executive Panel subsequently adopted the decision of the ADX control unit team and required Plaintiff to remain in the control unit for an additional 28 months.

The Complaint further avers that Plaintiff was improperly classified as a gang member based on a murder and conspiracy indictment in which he was described as an associate of the Aryan Brotherhood.  Although that indictment was dismissed after a mistrial, Plaintiff asserts that similar allegations subsequently were raised in a case filed in the United States District Court for the Southern District of California.  According to Plaintiff, although the government was required by court order to produce in discovery a validation package to support Mr. McIntosh's gang member designation, that documentation was not produced.  To the contrary, the Complaint alleges that BOP officials only formally validated Mr. McIntosh's alleged status as an Aryan Brotherhood member after he filed administrative complaints and appeals challenging his continued control unit placement.  Plaintiff contends that "[b]eing validated carries with it the burden of monthly urine tests, multiple breath analyzers" and "the very real possibility of being caught in an investigative dragnet that will end in conspiracy and/or RICO indictments and possibly [facing] the death penalty."  *Id.* at ¶¶ 92 and 93.

Plaintiff's Complaint generally alleges that confinement in a control unit "impose[s] atypical and significant hardships as compared to Federally operated 'open compound facilities,'" and that "control unit staff are legally obligated to provide mandatory monthly reviews of prisoners confined in a control unit."  *See* Complaint, at ¶¶ 4 and 5.  Claim One of the

8

Complaint alleges a "deprivation of liberty interest without due process of law" based on Defendants' failure to provide "mandatory due-process monthly reviews and 60-90 day Executive Panel reviews." *Id.* at ¶ 106.  Mr. McIntosh also contends that the failure to provide the required reviews had the effect of extending his "original control unit sentence of 60 months to 127 months" and effectively subject Plaintiff to  "atypical and significant hardships." *Id.* at ¶¶ 107 and 108.

Claim Two alleges a denial of equal protection to the extent that inmates in the ADX control unit who leave the unit to testify for the government "are never returned to the control unit" while inmates who leave to be prosecuted or testify for the defense "only have the first 30 days credited to their control unit time." *Id.* at ¶¶ 114-16.  In support of his equal protection claim, Mr. McIntosh also alleges that "prisoners away from the ADX control [unit] for prosecution or to testify for the defense are <u>not</u> credited day-for-day no matter what their behavior is." *Id.* at ¶ 118.  According to Plaintiff, this denial of equal protection "has imposed atypical and significant hardships" by extending his control unit sentence by an extra 67 months. *Id.* at ¶¶ 121 and 122.

Claim Three asserts an Eighth Amendment violation based upon Defendant's failure to provide required monthly and Executive Panel reviews, which allegedly had the effect of increasing Plaintiff's control unit classification for an additional 67 months.  Mr. McIntosh contends that this extended period itself "amounts to cruel and unusual punishment."

Claim Four contends that Mr. McIntosh was denied his First Amendment right to file grievances without retaliation.  Plaintiff alleges that Defendants SIA Krist and Captain Krist, as well as unnamed defendants, "are personally involved in validating McIntosh as an Aryan

9

Brotherhood gang member."  The fourth claim asserts that such validation occurred "only after McIntosh was indicted . . . tried, and case dismissed, twice," and "only after the BOP could not provide an official validation package per court order in 2007."  *Id.* at ¶¶ 143 and 144 (emphasis in original).  According to Plaintiff, "[t]his validation only occurred 10 days after McIntosh filed the final appeal over his extended control unit status."  *Id.* at ¶ 146 (emphasis in original).

Finally, Claim Five asserts that Plaintiff's substantive and procedural due process rights were violated to the extent Mr. McIntosh was validated as a gang member without being given a "meaningful opportunity to mitigate any 'evidence' the Defendants considered important."  *Id.* at ¶ 156.  Plaintiff also claims he was not provided "meaningful hearings before or after being validated."  *Id.*

The Complaint seeks a declaration that ADX Institutional Supplement 5212.07(e) is unconstitutional under the Equal Protection Clause and that "Plaintiff was entitled to Fifth Amendment due process protections while on writ and away from the ADX Florence control unit."  Mr. McIntosh also requests a court order "mandating that Defendants provide adequate and meaningful procedural due process protections against any gang validation classification."  Finally, Plaintiff requests nominal, compensatory and punitive damages, as well as attorneys fees and costs.

Defendants filed separate motions to dismiss in their "official" and "individual' capacities, generally arguing that Plaintiff's claims must be dismissed for lack of subject matter jurisdiction and for failure to state claims for relief, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  While each motion and  Plaintiff's responses rely on the same underlying facts and raises overlapping legal issues, the court will respect Defendants' "official/individual" construct

10

and address each motion separately.

## ANALYSIS

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a motion to dismiss may be granted if the court does not have subject matter jurisdiction over the matter. The determination of subject matter jurisdiction is a threshold question of law. *Madsen v. United States ex. rel. United States Army Corps of Engineers*, 841 F.2d 1011, 1012 (10th Cir. 1987). As courts of limited jurisdiction, federal courts may only adjudicate cases that the Constitution and Congress have granted them authority to hear. *See* U.S. Const. Art. III, §2; *Morris v. City of Hobart*, 39 F.3d 1105, 1111 (10th Cir. 1994). The court applies a rigorous standard of review when presented with a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. *Consumers Gas & Oil, Inc. v. Farmland Indus. Inc.*, 815 F. Supp. 1403, 1408 (D. Colo. 1992). "[T]he party invoking federal jurisdiction bears the burden of proof." *Marcus v. Kansas Dept. of Revenue*, 170 F.3d 1305, 1309 (10th Cir. 1999).

"Motions to dismiss pursuant to Rule 12(b)(1) may take two forms." *Amoco Production Co. v. Aspen Group*, 8 F. Supp.2d 1249, 1251 (D. Colo. 1998). First, a party may attack the facial sufficiency of the complaint and the court must accept the allegations of the complaint as true. *Id.* Second, a party may attack the factual assertions regarding subject matter jurisdiction through affidavits and other documents, and the court "has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995). Ultimately, "[t]he burden of establishing subject matter jurisdiction is on the party asserting jurisdiction." *Stine v.*

*Wiley*, 2008 WL 4277748, at *3 (D. Colo. 2008).[9]  The court can consider such extraneous materials under Rule 12(b)(1) without converting a motion to dismiss into a motion for summary judgment.  *Cf. King v. United States*, 53 F. Supp. 2d 1056, 1064 (D. Colo. 1999), *rev'd in part on other grounds*, 301 F.3d 1270 (10th Cir. 2002);  *Zerr v. Johnson*, 894 F. Supp. 372, 375 (D. Colo. 1995).

Rule 12(b)(6) states that a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  *See* Fed. R. Civ. P. 12(b)(6).  In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff."  *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).  However, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do."  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

To withstand a motion to dismiss, a complaint must contain enough allegations of fact "to state a claim to relief that is plausible on its face."  *Id.*  As the Tenth Circuit explained in *Ridge at Red Hawk, L.L.C. v. Schneider*, "the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."  493 F.3d 1174, 1177 (10th Cir. 2007).  "The burden is on the plaintiff to frame 'a complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief."  *Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell*

---

[9]        Copies of unpublished cases cited are attached to this Recommendation.

12

*Atlantic Corp.*, 555 U.S. at 556).  A complaint must set forth sufficient facts to elevate a claim

above the level of mere speculation.  *Id.*

> The court's function on a Rule 12(b)(6) motion is not to weigh potential
> evidence that the parties might present at trial, but to assess whether the plaintiff's
> complaint alone is legally sufficient to state a claim for which relief may be
> granted.  In doing so, the Court must accept all the well-pleaded allegations of the
> complaint as true and must construe them in the light most favorable to the
> plaintiff.  However, the Court need not accept conclusory allegations.
>
> Generally, [s]pecific facts are not necessary; the statement need only give
> the defendant fair notice of what the claim is and the grounds upon which it rests.
> However, where the well-pleaded facts do not permit the court to infer more than
> the mere possibility of misconduct, the complaint has alleged-but it has not
> shown-that the pleader is entitled to relief.  Even though modern rules of pleading
> are somewhat forgiving, a complaint still must contain either direct or inferential
> allegations respecting all the material elements necessary to sustain a recovery
> under some viable legal theory.  The plausibility standard requires that relief must
> plausibly follow from the facts alleged, not that the facts themselves be plausible.

*Jordan-Arapahoe, LLP v. Board of County Commissioners of the County of Arapahoe*, 2009 WL

2924777, at *2 (D. Colo. Sept. 9, 2009) (internal quotation marks and citations omitted).  The

ultimate duty of the court is to "determine whether the complaint sufficiently alleges facts

supporting all the elements necessary to establish an entitlement to relief under the legal theory

proposed."  *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

It must also be noted that "[t]hreadbare recitals of the elements of a cause of action,

supported by mere conclusory statements" will "not unlock the doors of discovery for a plaintiff

armed with nothing more than conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

Faced with a challenge under Rule 12(b)(6), a plaintiff finds no refuge by arguing "that a claim

just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the

discovery process through careful case management given the common lament that the success of

judicial supervision in checking discovery abuse has been on the modest side."  *Id.* at 685

13

(quoting *Bell Atlantic Corp.*, 550 U.S. at 559).

Although Defendants have moved separately in their "Official" and "Individual" capacities, the arguments advanced in these motions substantially overlap. For the benefit of the reader, I will limit my discussion of the Official Capacity Defendants' motion to the issues of subject matter jurisdiction and sovereign immunity. All other challenges to the Complaint will be addressed in the context of the Individual Capacity Defendants' motion.

The court's analysis is further complicated by the parties' proffer of extraneous affidavits and/or exhibits. The "Official Capacity Defendants" have supported their challenge to subject matter jurisdiction with a Declaration by Dan Sproul, the current ADX Control Unit Manager, and eleven related attachments. Although these materials are offered by the Official Capacity Defendants in support of their contention that Plaintiff's first three claims for relief should be dismissed as moot, much of this material seems superfluous given Mr. McIntosh's current status as a general population inmate at ADX and the undisputed fact that ADX adopted Institution Supplement 5212.07H on or about August 22, 2011.[10] Mr. McIntosh also attached several exhibits to his "Opposing Motion to Doc. 66," however, none of those exhibits are specifically referenced in that portion of Plaintiff's brief addressing the Office Capacity Defendant's challenge to subject matter jurisdiction. *See* Doc. #82, at page 8 of 90. I have considered the parties' affidavits and documents for the limited purpose of addressing the issue of subject matter jurisdiction.

---

[10]The court ventures to say that Mr. Sproul's Declaration provides a very incomplete documentary history of Mr. McIntosh's experience with BOP control unit evaluations and procedures.

*A.     The Official Capacity Defendants' Motion to Dismiss*

      1.     Plaintiff's Request for Declaratory and Injunctive Relief

Defendants contend that Mr. McIntosh's first three claims (challenging his control unit

status under the Fifth and Eighth Amendments) should be dismissed to the extent they seek

declaratory and/or injunctive relief, as those forms of relief have been rendered constitutionally

moot in light of Plaintiff's undisputed transfer from the ADX control unit on April 27, 2011 and

his current status as a general population inmate.  Mr. McIntosh argues in response that because

"I.S. 5212.07E(P) is merely worded slightly different from I.S. 5212.07H(P)," both provisions

"violate equal protection leaving the controversy still live."  *See* Plaintiff's Opposing Motion to

Doc. 66, at ¶ 38, citing.  In support of his position, Mr. McIntosh cites *United States v.*

*Concentrated Phosphate Export Ass'n*, 393 U.S. 199 (1968), and *Campbell v. California*, 200

U.S. 87 (1906).

      As courts of limited jurisdiction, federal district courts must carefully examine the facts

and law in every case to ensure that they have subject matter jurisdiction.  *See* Fed. R. Civ. P.

12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court

must dismiss the action.").  "T]his duty includes the obligation to examine . . . whether a

*favorable* judgment on the plaintiff's chosen cause of action would redress its claimed injuries."

*The Wilderness Society v. Kane County, Utah*, 632 F.3d 1162, 1179 n. 3 (10th Cir. 2011).  A

district court lacks subject jurisdiction where a case or a particular claim for relief is moot,

"because the existence of a live case or controversy is a constitutional prerequisite to federal

court jurisdiction."  *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109

(10th Cir. 2010) ("Without a live, concrete controversy, we lack jurisdiction to consider claims no

matter how meritorious."). "It is well established that what makes a declaratory judgment action 'a proper judicial resolution of a case or controversy rather than an advisory opinion is the settling of some dispute which affects the behavior of the defendant toward the plaintiff.'" *Cox v. Phelps Dodge Corp.*, 43 F.3d 1345, 1348 (10th Cir. 1994), citing *Ashcroft v. Mattis*, 431 U.S. 171, 172-73 (1977) (a claim for declaratory relief is moot when no "present right" is involved and the primary interest is the emotional satisfaction from a favorable ruling).

I conclude that Plaintiff's reliance on the decisions in *Concentrated Phosphate Export* and *Campbell* is misplaced under the particular facts of this case. In *Concentrated Phosphate*, the Supreme Court declined to dismiss the action as moot based on the voluntary dissolution of the defendant Association and the adoption of a new regulation by Agency for International Development ("AID"). The Supreme Court noted that "the dissolved association was not the only defendant in this case" and "the new AID regulation does not apply to all contracts on which the former members of the association might bid." *Concentrated Phosphate Export Ass'n*, 393 U.S. at 202-03. Similarly, the Supreme Court in *Campbell* concluded that the case had not become moot because the "the enactment of the subsequent [California state] statute [did not have] the effect of relieving the plaintiffs . . . from the burden imposed by the judgment below." *Campbell*, 200 U.S. at 92.[11]

---

[11]I also note the Supreme Court's recent decision in *Knox v. Service Employees International Union, Local 1000*, __ U.S. __, 132 S.Ct. 2277, 2287 (June 21, 2012). Rejecting the respondent's "mootness" argument, the Court held that "[a] case becomes moot only when it is impossible for a court to grant 'any effectual relief whatever' to the prevailing party," and that a case is not moot "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation." *Id.* Applying this reasoning, the majority in *Knox* concluded that a concrete dispute remained in that case as to the nature of the notice required to be given to non-union member employees who were objecting to the union's special assessment. I find that the facts in the instant case are distinguishable from the "concrete interest" at issue in *Knox*.

While the Supreme Court in *Concentrated Phosphate Export* acknowledged the "heavy burden" imposed on the party asserting mootness, the Tenth Circuit more recently has observed that this heavy burden does not prevent "government officials from discontinuing challenged practices and mooting a case." *See Rio Grande Silvery Minnow*, 601 F.3d at 1116. In the same decision, the Tenth Circuit observed that the

> "[w]ithdrawal or alteration of administrative policies can moot an attack on those policies." And the "mere possibility" that an agency might rescind amendments to its actions or regulations does not enliven a moot controversy. A case "cease[s] to be a live controversy if the possibility of recurrence of the challenged conduct is only a 'speculative contingency.'"

*Id.* at 1117 (internal citations omitted).

It is well-established that "once a case becomes moot, 'the federal court must dismiss the action for want of jurisdiction.'" *Jordan v. Sosa*, 654 F.3d 1012, 1023 (10th Cir. 2011). In this case, it is undisputed that Mr. McIntosh no longer is classified as an ADX control unit inmate and, therefore, is not subject to the policies, regulations and Institutional Supplements applicable to those prisoners. The Tenth Circuit has held that claims for injunctive and declaratory relief are moot where a prisoner has been transferred and is no longer subject to the conditions of confinement on which his claims are based. *See Burnett v. Jones,* 454 F. App'x 655, 657 (10th Cir. 2011), citing *Green v. Branson*, 108 F.3d 1296, 1300 (10th Cir. 1997).

As a general population inmate, any declaratory judgment relative to the constitutionality of Institutional Supplement 5212.07(e) would have no immediate effect on Defendants' behavior toward Mr. McIntosh and, therefore, would be purely advisory. *Cf. DeBerry v. Davis,* 460 F. App'x 796, 799 (10th Cir. 2012) (dismissing as moot the plaintiff-inmate's due process and equal protection claims insofar as the plaintiff sought equitable relief; held that plaintiff's request for

declaratory and injunctive relief relative to his previous status in the ADX step-down program was moot once he was "transferred back into general population . . . for reasons *independent of this case"*) (emphasis in original); *Jordan v. Wiley*, 2012 WL 1435933, at *3 (10th Cir. Apr. 26, 2012) (held that the injunctive relief sought by the plaintiff-inmate barring the application of BOP regulations to him in the future "would provide no remedy for the harm [plaintiff] claims to have suffered from that past application. . . . [a]ny such future need or harm is therefore purely speculative" and "could have 'no real effect in the real world'"). I find that the Official Capacity Defendants' motion to dismiss the declaratory and/or injunctive relief sought relative to claims one, two and three is well-founded and should be granted.

2.      Sovereign Immunity

The Official Capacity Defendants also argue that any claim for money damages based upon their official capacity is barred by the doctrine of sovereign immunity. "When an action is one against named individual defendants, but the acts complained of consist of actions taken by defendants in their official capacity as agents of the United States, the action is in fact one against the United States." *Atkinson v. O'Neal*, 867 F.2d 589, 590 (10th Cir. 1989) (federal employees, when sued in their official capacities, are immune from suit unless sovereign immunity has been waived), citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). *See also Weaver v. United States*, 98 F.3d 518, 520 (10th Cir. 1996). However, it is well-established that the United States is immune from suit unless it has consented to be sued. *United States v. Mitchell*, 445 U.S. 535, 538 (1980). *See also United States v. $30,006.25 in United States Currency*, 236 F.3d 610, 613 (10th Cir. 2000) (recognizing that a "waiver of sovereign immunity cannot be implied but must be unequivocally expressed"), citing *Mitchell*, 445 U.S. at 538. The United States has not waived

its sovereign immunity for constitutional torts.  *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 410 (1971).  *See also Hatten v. White*, 275 F.3d 1208, 1210 (10th Cir. 2002) (doctrine of sovereign immunity precludes a *Bivens* action  against the United States or agencies of the United States.).

Mr. McIntosh's response to the Official Capacity Defendants' Motion to Dismiss suggests that the United States has waived sovereign immunity by virtue of 18 U.S.C. § 3626 (providing "appropriate remedies with respect to prison conditions") and 28 U.S.C. § 1343 (providing federal district court with original jurisdiction over, *inter alia*, "any civil action authorized by law . . . to recover damages . . . because of the deprivation of any right or privilege of a citizen of the United States").  On closer examination, neither of these statutes provides the necessary waiver of sovereign immunity to support Plaintiff's claim for money damages against the Official Capacity Defendants.  Courts consistently have held that 28 U.S.C. § 1343 does not provide a waiver of sovereign immunity.  *See, e.g., Aloupis v. United* States, 149 F. App'x 889, 891 (11th Cir. 2005).  *See also Meuli v. United States*, 2011 WL 2650355, at *4 (D. Kan. July 6, 2011) (noting that the Tenth Circuit has held that sovereign immunity is not waived by 28 U.S.C. § 1343); *Abdelsamed v. United States*, 2002 WL 31409521, at *20 (D. Colo. Sept. 17, 2002) (holding that 28 U.S.C. § 1343 does not include a waiver of sovereign immunity).  While 18 U.S.C. § 3626 has been construed as a limited waiver of sovereign immunity, *see, e.g., Tanner v. Federal Bureau of Prisons*, 433 F. Supp. 2d, 117, 122 n. 6 (D.D.C. 2006), this statute specifically addresses "prospective relief . . . with respect to prison conditions," which is defined as "all relief other than compensatory monetary damages."  *See* 18 U.S.C. § 3626(g)(7).  Given the court's finding that Plaintiff's claims for injunctive and declaratory relief are moot as to Claims One,

19

Two and Three, there is no "prospective" relief available for purposes of § 3626.  *Cf. Brown v. Ridge*, 2006 WL 1581167, at *11 (W.D. La. Jan. 19, 2006) (holding that plaintiff's request for prospective injunctive relief under 18 U.S.C. § 3626 must be dismissed as moot since plaintiffs had been transferred from the institution that was the site of the alleged violations).

Accordingly, the claims for money damages against Defendants in their official capacities must be dismissed and Plaintiff may recover money damages, if at all, against Defendants in their personal capacities.

B.    *The Individual Capacity Defendants' Motion to Dismiss*

1.    Defendants' Challenge to Personal Jurisdiction

Defendants Lappin, Revell, Sherrod, Murphy, Nelson, Carney, Santiago, R. Davis, Rau, Adelsberger, and Bozman (collectively, the "non-Colorado Defendants") have moved to dismiss, arguing that this court lacks general or specific personal jurisdiction over these individuals.  Mr. McIntosh contends, to the contrary, that these non-Colorado Defendants took actions directed at a Colorado resident to the extent they conducted control unit reviews on behalf of ADX.

Under Rule 12(b)(2), a motion to dismiss may be granted if the court does not have personal jurisdiction over a party.  While a plaintiff bears the burden of establishing personal jurisdiction over a non-resident defendant, at this stage of the litigation, the plaintiff's burden is minimal.  *See Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995).  "When the issue is raised before trial and decided on the basis of affidavits and other written materials, a plaintiff need only make a prima facie showing."  *Wise v. Lindamood,* 89 F. Supp. 2d 1187, 1189 (D. Colo. 1999).  All disputed facts and all reasonable inferences must be drawn in the plaintiff's favor.  *Behagen v. Amateur Basketball Ass'n of U.S.A.*, 744 F.2d 731, 733 (10th Cir. 1984).

"However, 'only the well pled facts of plaintiff's complaint, as distinguished from mere conclusory allegations, must be accepted as true." *Wise,* 89 F. Supp. 2d at 1189.   The court also should accept as true those facts presented in defendant's affidavits that remain unrefuted by plaintiff.   *See Glass v. Kemper Corp.*, 930 F. Supp. 332, 337 (N.D.Ill. 1996).

The court may exercise jurisdiction over a non-resident defendant only if the applicable state long-arm statute confers jurisdiction and the exercise of personal jurisdiction is consistent with constitutional due process.   As to the first issue, the court must look to Colorado's long-arm statute and its enumerated grounds for jurisdiction.[12]   However, Colorado's statute has been construed liberally to permit personal jurisdiction to the full extent permitted by the Due Process Clause of the United States Constitution.   *See Waterval v. District Court*, 620 P.2d 5, 8 (Colo. 1980).   Thus, the court must simply determine whether the exercise of personal jurisdiction over the non-Colorado Defendants in this case is consistent with due process.

Plaintiff alleges, and apparently concedes, that during the relevant time period, Defendant Lappin was the Director of the Federal Bureau of Prisons with his office in Washington, D.C.   It is also undisputed that Defendant Lappin was charged with ultimate responsibility for BOP facilities in Colorado.   Defendants Rau, Adelsberger, Bozman, and R. Davis were, during the relevant time period, BOP employees assigned to USP-Marion.   Defendants Revell, Sherrod , Murphy, Nelson, Carney, and Santiago were, during the relevant time period, assigned to FCI-Greenville.

Accepting the factual allegations in the Complaint as true for purposes of the instant

---

[12]Acts which will subject a non-resident to the jurisdiction of Colorado courts include "the transaction of any business within this state" and "the commission of a tortious act within this state."   *See* C.R.S. § 13-1-124(1)(a) and (b).

21

motions, there does not appear to be any basis for asserting general jurisdiction over the non-

Colorado Defendants.  General jurisdiction arises from a defendant's continuous and systematic

activity in the forum state.  *Wise*, 89 F. Supp.2d at 1189-90.  To establish general jurisdiction, the

non-resident's activities must create a "substantial connection" with the forum state, from which

the court can conclude that the defendant has "purposely avail[ed] itself of the privilege of

conducting activities within the forum."  *Id.*  Random, attenuated, or fortuitous activities by the

defendant will not suffice to establish general jurisdiction.  *Burger King v. Rudzewicz*, 471 U.S.

462, 475 (1985).  The Complaint does not allege any facts that would demonstrate continuous

and systematic activity in this forum by any non-Colorado Defendant.  *See TJS Brokerage & Co.,*

*Inc. v. Mahoney*, 940 F. Supp. 784, 787 (E.D. Pa. 1996) (once personal jurisdiction has been

challenged, plaintiff's jurisdictional allegations must be supported with appropriate affidavits or

documents).

As an alternative basis for personal jurisdiction, specific jurisdiction is predicated upon a

defendant's minimum contacts with the forum that give rise to the cause of action.  *Kuenzle v.*

*HTM Sport-Und Freizeitgerate AG*, 102 F.3d 453, 455 (10th Cir. 1996).  The court must consider

whether "the defendant has 'purposefully directed' his activities at residents of the forum . . . and

the litigation results from alleged injuries that 'arise out of or relate to' those activities."  *Burger*

*King*, 471 U.S. at 472.  The Supreme Court has held that the foreseeability of causing injury in

the forum state is not sufficient to establish the requisite minimum contacts.  Rather, the contacts

must result from the defendant's own actions and must create a "substantial connection with the

forum."  *Id.* at 475.  "Purposeful availment requires actions by the Defendant which 'create a

substantial connection with the forum state.'"  *OMI Holdings, Inc. v. Royal Insurance Co.*, 149

F.3d 1086, 1092 (10th Cir. 1998), quoting *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 109 (1987).

The court finds that Mr. McIntosh has not sustained his *prima facie* burden.  Indeed, Plaintiff's arguments with respect to Defendant Lappin are contrary to the substantial weight of judicial precedents.  *See, e.g., Gambina v. Federal Bureau of Prisons*, 2011 WL 4505085, at *3-4 (D. Colo. Sept. 29, 2011) (holding that the court did not have personal jurisdiction over BOP Regional Director by virtue of his involvement in decisions impacting prisoners housed in Colorado or his alleged failure to meaningfully review the circumstances of the plaintiff's confinement at ADX); *McMillan v. Wiley*, 813 F. Supp. 2d 1238, 1246 (D. Colo. 2011) (holding that Defendant Lappin did not have the requisite "minimum contacts" with Colorado simply because he had direct knowledge and had approved the plaintiff's transfer from general population to the ADX control unit); *Nichols v. Federal Bureau of Prisons*, 2010 WL 3219998, at *3-4 (D. Colo. Aug. 12, 2010) (holding that it was not reasonable to suggest that Defendant Lappin might be hauled into court in Colorado "simply because [he has] . . . national supervisory responsibilities over facilities within the forum state;" "receipt of grievances and letters is insufficient to establish personal jurisdiction" over national or regional BOP officials); *Durham v. Lappin*, 2006 WL 2724091, at *5 (D. Colo. Sept. 21, 2006) (in dismissing claim against BOP Director, National Inmate Appeals Administrator and BOP Regional Director, held that their contacts with the forum state "were completely fortuitous resulting from the fact that the Plaintiff . . . was located in Colorado").  *Compare Arocho v. Nafziger*, 2010 WL 681679 (10th Cir. March 1, 2010) (holding that Defendant Lappin had purposefully directed his activities at a specific inmate at ADX when Lappin was actively and directly responsible for the denial of medical

treatment recommended for inmate Arocho by prison medical personnel).

Mr. McIntosh's rationale for personal jurisdiction over Defendants Revell, Sherrod, Rau, Murphy, Nelson, Adelsberger, Carney, Bozman, R. Davis, and Santiago is no more persuasive. There are absolutely no allegations in the Complaint that would demonstrate these Defendants, during the relevant period, had continuous and systematic business contacts with this forum such that the court could assert general personal jurisdiction. Similarly, the court can find specific personal jurisdiction only if these non-resident defendants "purposely" directed their activities at Mr. McIntosh, a forum resident, and Plaintiff's claims arise out of those activities. *Cf. Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008). Both of these requirements must be satisfied to establish specific personal jurisdiction. Yet, Mr. McIntosh acknowledges that his contacts with these individuals only occurred while he was a resident of Illinois.

Defendants' nexus with the forum state must be based on something more than Plaintiff's subsequent transfer back to ADX. *Cf. Zenergy, Inc. v. Coleman*, 2009 WL 3571314, at *8 (N.D. Ok. Oct. 26, 2009) (noting that "[c]ourts have found no nexus between the defendants' contacts with the forum and the litigation where the plaintiff moved to the forum state after the relationship began"). *Cf. Allmon v. Bureau of Prisons*, 2010 WL 2163773, at *2 (D. Colo. May 26, 2010) (finding that the Colorado District Court did not have personal jurisdiction over a warden and a lieutenant assigned to the United States Penitentiary, Terre Haute, Indiana. *See also Akers v. Watts*, 740 F. Supp. 2d 83, 91-92 (D.D.C. 2010) (holding that the District Court for the District of Columbia did not have personal jurisdiction over BOP employees for alleged conduct that occurred at BOP facilities in Kansas and Colorado); *Coleman*

*v. Lappin*, 2011 WL 4586922, at *4 (E.D. Ky. Sept. 29, 2011) (holding that BOP employees at USP Terre Haute could not have reasonably foreseen or anticipated that they could be haled into a federal court in Kentucky based on their alleged actions in Indiana); *James v. United States*, 2010 WL 3789310, at *3-4 (N.D. Cal. 2010) (finding that the inmate-plaintiff in California had not established personal jurisdiction over the acting warden of the Federal Medical Center in Minnesota, where the alleged violations took place at the BOP facility in Minnesota and there was no evidence that would establish the defendant had the requisite minimum contacts with the forum state); *Elrod v. Walker*, 2010 WL 1285066, at *4 (D. Kan. 2010) (holding that the court could not exercise personal jurisdiction over non-resident BOP employees who allegedly violated the plaintiff's constitutional rights while he was incarcerated at the United States Penitentiary in Lewisburg, Pennsylvania).  Fundamental notions of due process require a more substantial and purposeful nexus to this forum than the allegations in Plaintiff's Complaint establish or even suggest.

In the absence of a *prima facie* showing of personal jurisdiction, Defendants Lappin, Revell, Sherrod, Murphy, Nelson, Carney, Santiago, Davis, Rau, Adelsberger, and Bozman should dismissed from this action and all claims against these non-Colorado Defendants should be dismissed without prejudice.  *Cf. Goff v. Hackett Stone Co.*, 185 F.3d 874, at *2 (10th Cir. 1999) (holding that dismissal for lack of personal jurisdiction should be without prejudice).

2.      Defendants' Statute of Limitations Challenge

Mr. McIntosh alleges in his First, Second and Third Claims that his due process and equal protection rights under the Fifth Amendment, as well his Eighth Amendment right against cruel and unusual punishment, were violated to the extent his assignment to the ADX control unit was

extended by an additional 67 months.  Mr. McIntosh contends that his control unit placement should have expired in August 2005 while he was assigned to USP-Marion, and that his continued assignment to the control unit constituted cruel and unusual punishment.  Defendants argue that Mr. McIntosh is barred by the applicable statute of limitations from pursuing any claims that a arose prior to April 29, 2009.

It is well-settled that a *Bivens* action is subject to the statute of limitations of the personal injury statute in the statue where the action arose.  *See Industrial Constructors v. United States Bureau of Reclamation*, 15 F.3d 963, 968 (10th Cir. 1994), citing *Wilson v. Garcia,* 471 U.S. 261 (1985).  In this case, Mr. McIntosh is alleging constitutional violations that occurred in Colorado (ADX) and Illinois (USP-Marion and FCI-Greenville).  However, I note that both Colorado and Illinois recognize a two-year limitation period for civil rights actions arising under federal law. *See Denton v. United States*, 440 F. App'x 498, 500 (7th Cir. 2011) (noting "the two-year statute of limitations applicable to civil-rights claims arising in Illinois") and C.R.S.. § 13-80-102 (setting a two-year limitation period for "all actions upon liability created by a federal statute where no period of limitation is provided in said federal statute").  The Complaint in this case was filed on April 29, 2011 and therefore, any *Bivens* claim that accrued prior to April 29, 2009 would be barred by the statute of limitations.

"Although state law establishes the statute of limitations, federal law determines when plaintiffs' federal *Bivens* claims accrued."  *Van Tu v. Koster*, 364 F.3d 1196, 1199 (10th Cir. 2004) (citation omitted). "Under federal law, the statute of limitations on a *Bivens* claim begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action." *Id..* (internal quotation marks and citation omitted).  *See also*

*Kripp v. Luton*, 466 F.3d 1171, 1175 (10th Cir. 2006) ("[F]or *Bivens* actions (the federal analogue to § 1983 claims), we have held that a claimant's cause of action accrues when the claimant knew or had reason to know 'of the existence and cause of injury which is the basis for his action.'") (citation omitted).  "[I]t is not necessary that a claimant know all of the evidence ultimately relied on for the cause of action to accrue."  *Baker v. Board of Regents of State of Kansas*, 991 F.2d 628, 632 (10th Cir. 1993).

"At the motion-to-dismiss stage, a complaint may be dismissed on the basis of a statute-of-limitations defense only if it appears beyond a doubt that Plaintiff[ ] can prove no set of facts that toll the statute."  *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 n. 13 (11th Cir. 2005) (internal quotation marks and citations omitted).  *See also United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005) (complaint may be dismissed where the "allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense, such as when a complaint plainly reveals that an action is untimely under the governing statute of limitations") (citation omitted); *Bullington v. United Air Lines Co.*, 186 F.3d 1301, 1310 n. 3 (10th Cir. 1999) (noting "that Rule 12(b)(6) is a proper vehicle for dismissing a complaint that, on its face, indicates the existence of an affirmative defense such as noncompliance with the limitations period") (citation omitted), *implicitly overruled on other grounds as recognized by Boyer v. Cordant Technologies*, 316 F.3d 1137, 1140 (10th Cir. 2003); *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1041 n. 4 (10th Cir. 1980) ("While the statute of limitations is an affirmative defense, when the dates given in the complaint make clear that the right sued upon has been extinguished, the plaintiff has the burden of establishing a factual basis for tolling the statute."); *Doe v. U.S. Dept. of Justice*, 753 F.2d 1092, 1116 (D.C. Cir. 1985) (a defense based on the statute of limitations is an

affirmative defense that cannot succeed on a Rule 12(b)(6) motion unless it is unequivocally

apparent from the face of the complaint that the statute precludes the action).

Mr. McIntosh's Complaint alleges that he was transferred to the ADX control unit on July

28, 2000, and received monthly reviews and 90-day Executive Panel reviews from September

2000 to May 2003.  Plaintiff further contends that after being transferred to USP-Marion, he was

not given monthly reviews from June 2003 to August 2005, or Executive Panel reviews between

June 2003 and September 14, 2006.  *See* Complaint, at ¶¶ 16 and 17.  If I credit these allegations

as true, it would seem that Mr. McIntosh knew or had reason to know, at least by September 14,

2006, that the USP-Marion Defendants were not complying with BOP regulations.[13]  *Cf.*

*Silverstein v. Federal Bureau of Prisons*, 2011 WL 4552540, at *9 (D. Colo. Sept. 30, 2011)

(Brimmer, J.) (holding that the plaintiff had not alleged a continuing violation for statute of

limitations purposes where the plaintiff was challenging review proceedings that occurred over

different periods of his incarceration and involved different decision makers at different

institutions); *Gambina*, 2011 WL 4502085, at *4 ("Cases from the District of Colorado have . . .

found that inmate classifications decisions constitute discrete events, each subject to its own

statute of limitations, rather than a 'continuing one.'").[14]  Thus, any claims against Defendants

---

[13]Plaintiff implicitly concedes this point, stating that "McIntosh assumed the BOP was simply to (sic.) lazy to actually conduct the mandatory monthly reviews, but they were at least filling out the paperwork."  (*See* Opposing Motion to Doc. 66 (doc. # 82) at ¶ 24).

[14]The Tenth Circuit in *Fogle v. Slack*, 419 Fed. Appx. 860, 864-65 (10th Cir. 2011) specifically declined to decide whether the continuing violation doctrine applies to cases brought under §1983 and, by extension, to *Bivens* actions.  However, the Tenth Circuit concluded that it would be inappropriate to apply the continuing violation doctrine to separate administration "segregation decisions . . . made by different decision makers across three different correctional facilities."  *Id.*  Even in the context of Title VII, from which the continuing violation doctrine is derived, discrete decisions are not treated as part of a continuing violation.  *See, e.g., Davidson v. America Online, Inc.*, 337 F.3d 1179, 1185 (10th Cir. 2003) (concluding "that when a plaintiff

28

Stepp, R. Davis, Rau, Adelsberger, Bozman,, Vanyur and Nalley arising from those alleged

regulatory transgressions should have been brought on or before September 14, 2008.

Similarly, the Complaint asserts that on September 14, 2006, Mr. McIntosh was

transferred from USP-Marion to the control unit at FCI-Greenville.  Plaintiff alleges that he did

not receive any monthly reviews while at FCI-Greenville between December 2006 and July 2008,

and that Defendants Vanyur, Nalley and Conley never conducted any Executive Panel reviews

while he was incarcerated at FCI Greenville.  *See* Complaint, at ¶¶ 41 and 44.   Accepting these

allegations as true, Mr. McIntosh knew or had reason to know, at least by July 2008, that the

FCI-Greenville Defendants had denied him review procedures required by BOP regulations.

Thus, any claims against Defendants Revell, Sherrod, Murphy, Nelson, Carney, Santiago,

Conley, Vanyur and Nalley based on those alleged regulatory transgressions should have been

brought on or before July 2010.

Mr. McIntosh's claims relating to events or omissions that occurred at USP-Marion and

FCI-Greenville appear to be barred by the statutes of limitations, unless he shows a basis for

tolling the limitations periods.  As an affirmative defense, a statute of limitations may be subject

to certain defenses such as waiver, estoppel, or equitable tolling.  *See Rotella v. Wood*, 528 U.S.

549, 560 (2000) (federal statutes of limitations "are generally subject to equitable principles of

tolling").  However equitable tolling is employed as an "exception, not the rule." *Id.* at 561.

Colorado law "recognizes that 'equity may require a tolling of statutory period where flexibility

---

pursues several disparate treatment claims based on discrete discriminatory acts, the limitations
period will begin to run for each individual act from the date on which the underlying act
occurs."); *De Leon Otero v. Rubero*, 820 F.2d 18, 20 (1st Cir. 1987) (defendants' refusal to
reinstate plaintiff "was not a separate act of discrimination, but rather a consequence of his initial
demotion.").

is required to accomplish the goals of justice,'" but limits the doctrine of equitable tolling "to situations in which either the defendant has wrongfully impeded the plaintiff's ability to bring the claim or extraordinary circumstances prevent the plaintiff from filing his . . . claim despite diligent efforts." *Braxton v. Zavaras*, 624 F.3d 1156, 1161 (10th Cir. 2010), quoting *Dean Witter Reynolds, Inc. v. Hartman*, 911 P.2d 1094, 1096 (Colo. 1996). "The 'extraordinary circumstances' aspect of equitable tolling is based on the reasoning 'that it is unfair to penalize the plaintiff for circumstances outside his or her control, so long as the plaintiff makes good faith efforts to pursue claims when possible.'" *Braxton,* 624 F.3d at 1161. However, "a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) some extraordinary circumstances stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)

Plaintiff alleges that his original 60-month sentence to the control unit expired in August 2005 and that he asked Defendant Adelsberger in August 2005 to be released from control unit status. If Plaintiff's understanding of his control unit placement was correct, he should have been released from the control unit in August 2005. Yet, Mr. McIntosh concedes that his control unit status remained unchanged through his stay at USP-Marion and FCI-Greenville. Moreover, as long as Plaintiff remained in a control unit status, he was contemporaneously aware that he was not receiving monthly reviews. Although Defendant Adelsberger reportedly told Mr. McIntosh that he would "check into it," it should have been immediately apparent that Defendant Adelsberger's inquiries had no effect on Mr. McIntosh's status.[15]   More importantly, the

---

[15]The Complaint references e-mails that Mr. McIntosh obtained through the Freedom of Information Act on an unspecified date. *See* Complaint at ¶¶ 22-24. According to the Complaint, these e-mails advised Defendant Adelsberger that Mr. McIntosh was to remain in

Complaint does not include any factual allegation that would suggest Defendant Adelsberger or any other BOP employee at USP-Marion or FCI-Greenville made any statement or took any action that would have lulled Mr. McIntosh into inaction or deceived Mr. McIntosh as to his continued status as a control unit inmate. *Cf. Maghee v. Ault*, 410 F.3d 473, 476 (8th Cir. 2005) (equitable tolling is appropriate "when some fault on the part of the defendant has caused a plaintiff to be late in filing, or when other circumstances, external to the plaintiff and not attributable to his actions, are responsible for the delay"); *Colorado-Ute Elec. Ass'n, Inc. v. Envirotech Corp.*, 524 F. Supp. 1152, 1156 (D. Colo. 1981) ("The law will not allow one to lull an opponent to sleep on its rights and then raise the passage of time as a defense.").  This court finds no allegations in the Complaint that would support an equitable tolling argument as to the USP-Marion and FCI-Greenville Defendants.[16]

Defendants Conley, Davis, Fluck, Nalley, Sproul and Wiley also argue that the statute of limitations bars any claims Mr. McIntosh might assert against them for events that occurred prior to April 29, 2009.  Again, the court starts its analysis by considering the factual allegations in the Complaint.  Mr. McIntosh contends that following his return to ADX on November 18, 2008, he improperly remained in the control unit for more than two years until his release to general population on April 27, 2011.  From those undisputed facts, Mr. McIntosh cannot plausibly suggest that after November 18, 2008 Defendants lulled him into inaction or misrepresented his

---

control unit status until his return to ADX at the conclusion of his writ.

[16]The Complaint alleges that because "the BOP engaged in activities keeping McIntosh from going back to the ADX-Max he would argue that he has filed before the statute of limitations has run out."  *See* Complaint at ¶ 30.  There are no facts alleged in the Complaint that would suggest the USP-Marion or FCI-Greenville Defendants played any role in the decision to keep Plaintiff from returning to ADX.

continued placement in the control unit.  There are no facts in the Complaint that would support an equitable tolling argument for any violations by Defendants that occurred prior to April 29, 2009.  Accordingly, the court recommends that all claims against Defendants Stepp, R. Davis, Rau, Adelsberger, Bozman, Revell, Sherrod, Murphy, Nelson, Carney, and Santiago be dismissed without prejudice as barred by the statute of limitations.  *Cf. Smith v. Union Pacific R. Co.*, 2012 WL 1130279, at *3 (7th Cir. April 5, 2012) (while agreeing dismissal on grounds of untimeliness was proper, the dismissal should have been without prejudice and the plaintiff should have been afforded an opportunity to plead facts that would establish equitable tolling).  Any claims asserted by Mr. McIntosh against Defendants Conley, Nalley, Wiley, B. Davis, Sproul, Fluck, and Vanyur based on conduct that occurred prior to April 29, 2009 should also be dismissed without prejudice for the same reason.  Based upon this recommendation, the court is left to determine to what extent, if at all, Plaintiff's Complaint asserts viable claims against Defendants Conley, Nalley, Wiley, B. Davis, Sproul, Fluck, Krist, Krist and Vanyur for conduct that occurred on or after April 29, 2009.

>    3.    First Claim - Due Process

The Individual Defendants have moved to dismiss Plaintiff's First Claim, arguing that Mr. McIntosh has failed to state a plausible claim under the Due Process Clause relating to events that occurred after April 29, 2009.  Plaintiff alleges that after he returned to ADX in November 2008, he explained to the ADX control unit team that he had been in a control unit status throughout his absence on writ and, therefore, had long ago completed his 60-month sentence.  *See* Complaint, at ¶ 55.  The control unit team told Mr. McIntosh that he would be required to serve an addition 28 months in the control unit, but apparently suggested that they

might "reconsider" that decision "if he could prove his claims." *Id.* at ¶ 56. However, the

Executive Panel subsequently adopted the recommendation of the ADX control unit team. The

First Claim is not challenging the initial decision to assign Mr. McIntosh to the control unit. In

fact, that claim would seem to be time-barred. Rather, the Complaint asserts that the Individual

Defendants "deprived McIntosh of a protected liberty interest, has imposed atypical and

significant hardships, extended McIntosh's 60 months control unit sentence to 127 months,

resulting in 67 months of cruel and unusual punishment." *See* Complaint, at ¶33.

"To state a due process claim, [Mr. McIntosh] must allege two elements: (1) that a

recognized liberty or property interest has been interfered with by the Defendants, and (2) that the

procedures attendant to that deprivation were not constitutionally sufficient." *Matthews v. Wiley*,

744 F. Supp. 2d 1159, 1170 (D. Colo. 2010), citing *Kentucky Dept. of Corrections v. Thompson*,

490 U.S. 454, 460 (1989). The first step in the court's due process analysis involves identifying

the existence of a liberty interest sufficient to require procedural protections prior to its

deprivation. In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Supreme Court held that an

inmate's liberty interest is protected under the Due Process Clause if restraints or conditions

impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of

prison life." Whether confinement "conditions impose such an atypical and significant hardship

that a liberty interest exists is a legal determination . . . ." *Beverati v. Smith*, 120 F.3d 500, 502

(4th Cir. 1997), citing *Sandin*, 515 U.S. at 485-87.

The Tenth Circuit has identified the following non-dispositive factors that may be

relevant to determining whether conditions of confinement implicate a protected liberty interest:

(1) whether the classification or conditions relate to and further a legitimate penological interest,

such as safety or rehabilitation; (2) whether the conditions of placement are extreme; (3) whether the classification or placement increases the duration of confinement; and (4) whether the placement is indeterminate. *DiMarco v. Wyoming Department of Corrections*, 473 F.3d 1334, 1342 (10th Cr. 2007) (also acknowledging that "any assessment must be mindful of the primary management role of prison officials who should be free from second-guessing or micro-management from the federal courts").

The first factor, whether the classification or placement relates to a penological interest, arguably supports the Individual Defendants' position. The Complaint acknowledges that control units are designed to separate those inmates "who are unable to function in a less restrictive environment without being a threat to others or to the orderly operation of the institution." *See* Complaint, at ¶ 3. Defendants contend that Mr. McIntosh was recommended for placement in the control unit based upon his alleged participation in the fatal stabbing of a fellow inmate at USP-Marion on May 18, 1999. I find that Plaintiff's control unit status was related to and stemmed from a legitimate penological interest. *Cf. Rezaq v. Nalley*, 677 F.3d 1001, 1014 (10th Cir. 2012) (holding that segregated confinement furthers security and safety concerns).

The second and third factors identified by the Tenth Circuit also weigh more favorably for Defendants. Mr. McIntosh has not alleged, and there is nothing in the record to suggest, that his placement in the control unit increased the duration of Plaintiff's underlying sentence. The Complaint also offers no factual allegation that describe Mr. McIntosh's conditions of confinement in the control unit. Mr. McIntosh simply claims that "confinement in a control unit imposes atypical and significant hardships as compared to federally operated 'open compound facilities,'" and that while he was incarcerated in US-Marion and FCI-Greenville, he was

held,"with only a few minor changes," under the exact same control unit restrictions, hardships and security that he endured while in the ADX control unit.  *See* Complaint, at ¶¶ 4, 13 and 35.

The Tenth Circuit has held that "the transfer of an inmate to less amenable and more restrictive quarters for non-punitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." *Penrod v. Zavaras*, 94 F.3d 1399, 1406 (10th Cir. 1996).  *Cf. Fiorentino v. Biershbach*, 64 F. App'x 550, 552 (7th Cir. 2003) (segregated confinement "to a cell nearly 24 hours a day" and deprivation "of various rights and privileges enjoyed by the general prison population such as smoking, watching TV, listening to the radio, using the telephone, accessing the law library, and participating in recreational and religious programs . . . did not constitute an atypical, significant deprivation that would create a liberty interest protected by due process").  The Tenth Circuit has acknowledged that "extreme conditions in administrative segregation do not, on their own, constitute an 'atypical and significant hardship' when compared to the 'ordinary incidents of prison life.'" *Rezaq*, 677 F.3d at 1013 (holding that conditions at ADX "do not, in and of themselves, give rise to a liberty interest because they are substantially similar to conditions experienced in any solitary confinement setting"); *Silverstein*, 2011 WL 4552540, at *12 (observing that "no court in the Tenth Circuit has held that the conditions at ADX, regardless of the unit, are extreme").

The final factor for the court's consideration is the duration of Mr. McIntosh's control unit placement.  There is no doubt that the duration of Mr. McIntosh's control unit placement was adversely affected by his transfer on writ to USP-Marion and FCI-Greenville.  For more than five years, Mr. McIntosh was subject to a review process that had little, if any, practical effect on completion of his control unit sentence.  Since Mr. McIntosh had no control over the

investigation and prosecution of other cases in which he was a named defendant or transfers within the BOP system related to those cases, there was a period during which Plaintiff's control unit status was, to some extent, indeterminate.  *But see Jordan v. Federal Bureau of Prisons*, 191 F. App'x 639, 652-53 (10th Cir. 2006) (concluding that no liberty interest was implicated where the duration of an inmate's confinement in administrative segregation was prolonged by an ongoing investigation into the inmate's criminal conduct and his significant history of violent and disruptive behavior).

However, Plaintiff concedes that after his return to ADX in November 2008, he was told that his control unit placement would continue for an additional 28 months, which would undercut any claim that the placement was indefinite.  It is also appears to be undisputed that Mr. McIntosh's placement was subject to review by the control unit team and the Executive Panel after November 2008, and that Plaintiff exercised his right to appeal from those determinations. *Cf. Rezaq*, 677 F.3d at 1016 (holding that the availability of periodic reviews . . . suggests that the confinement was not indefinite" and weighs against finding a liberty interest); *Hunt v. Sapien*, 480 F. Supp. 2d 1271, 1277 (D. Kan. 2007) ( holding that the plaintiff's placement in administrative segregation was not indefinite where his confinement was reviewed weekly and then monthly).

Based on the well-pled facts in the Complaint, the court concludes that Mr. McIntosh has not alleged conditions of confinement that were "atypical" or "significant . . . in relation to the ordinary incidents of prison life" for inmates at ADX.  *Cf. Driggers v. Clark* , 422 F. App'x 747, 750 (10th Cir. 2011) (affirming dismissal of plaintiff's due process claims based upon the inmate's failure to allege sufficient facts to demonstrate that defendants' actions had impacted a

constitutionally protected liberty interest).  As the Plaintiff's allegations do not implicate a protected liberty interest, the court is not required to determine whether Mr. McIntosh was provided with sufficient due process protections during the period after April 29, 2009.  *Cf. Silverstein*, 2011 WL 4552540, at *16.

      4.     Second Claim - Equal Protection

The Second Claim, directed against Defendants Lappin, Conley, Nalley, Wiley, B. Davis, Sproul and Fluck, alleges that Mr. McIntosh was denied equal protection to the extent that he was given no credit for time spent away from the ADX control unit, while prisoners who are "awaiting transfer to the ADX control unit have day-for-day credit given to them as long as they do not receive any more incidents."  Plaintiff also summarily asserts that "inmates who leave the ADX control unit to testify for the government are never returned to the control unit."  Defendants contend these allegations do not state a plausible claim for relief.

The fundamental guarantee of the Equal Protection Clause is that "all persons similarly situated shall be treated alike."  *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 439 (1985).  The Equal Protection Clause does not forbid classifications, but simply prevents governmental decision makers from treating differently persons who are in all relevant respects alike.  *Juarez v Renico*, 149 F. Supp.2d 319, 324 (E.D. Mich. 2001).  Arbitrarily discriminating between groups that are similarly situated may give rise to an equal protection claim.  *See Jacobs, Visconsi & Jacobs v. City of Lawrence*, 927 F.2d 1111, 1118-19 (10th Cir. 1991) (discussing "similarly situated" requirement of equal protection claim).

The Equal Protection Clause, however, does permit classifications and distinctions which neither burden fundamental rights nor target a suspect class, provided that such classifications or

distinctions bear a rational relation to some legitimate end. *Vacco v. Quill*, 521 U.S. 793, 799

(1997).

> When equal protection challenges arise in a prison context, however, courts must
> adjust the level of scrutiny to ensure that prison officials are afforded the
> necessary discretion to operate their facilities in a safe and secure manner. In a
> prison context, therefore, we must determine whether the disparate treatment is
> "reasonably related to [any] legitimate penological interests" . . . Accordingly, to
> state a claim upon which relief may be granted, [plaintiff] must allege facts
> sufficient to overcome the presumption of reasonableness applied to prison
> policies.[17]

*Veney v. Wyche*, 293 F.3d 726, 732 (4th Cir. 2002). *Cf. Jones v. North Carolina Prisoners'*

*Union, Inc.*, 433 U.S. 119, 134 (1977) (holding that prison administrators "need only

demonstrate a rational basis for their distinctions" when classifying inmates). A plaintiff

asserting an equal protection claim must do more than simply point out that other inmates are

treated differently, or summarily dismiss as invalid the reasons underlying this disparate

treatment. *Harrison v. Morton*, 2012 WL 3104880, at *5 (10th Cir. Aug. 1, 2012), quoting

*Templeman v. Gunter*, 16 F.3d 367, 371 (10th Cir. 1994).

"[P]laintiff must . . . allege facts sufficient to establish 'the distinction between himself

and other inmates was not reasonably related to some legitimate penological purpose.'"

*Harrison*, 2012 WL 3104880, at *5. The regulations governing BOP control units implicitly

recognize that the Executive Panel's "evaluation of an inmate's readiness for release from a

control unit" should be based on several different factors. *See* 28 C.F.R. § 541.50(a). Given this

discretion, "it is not plausible that 'there are no relevant differences between [Mr.McIntosh] and

---

[17]Plaintiff ignores this presumption and misconstrues his burden under Rule 12(b)(6)
when he argues that "Defendants must show a rational basis for denying McIntosh control unit
credit while on writ, and yet gives someone else credit who has been assigned and waiting actual
placement into the control unit." *See* Opposing Motion to Doc. 66, at ¶ 47.

other inmates that reasonably might account for their different treatment.'" *Cf. Templeman v. Gunter*, 16 F.3d 367, 371 (10th Cir. 1994) (recognizing that prison officials may "classify inmates differently because of slight differences in their histories," as well as "because some still seem to present more risk of future misconduct than others").

To properly allege an equal protection claim, Mr. McIntosh also must plead facts to demonstrate that his different treatment "was the result of intentional or purposeful discrimination." *Watson v. City of Kansas City, Kansas*, 857 F.2d 690, 694 (10th Cir. 1996) ("A plaintiff in an equal protection action has the burden of demonstrating discriminatory intent."). Although "[t]he discriminatory purpose need not be the only purpose, . . . it must be a motivating factor in the decision." *Villanueva v. Carere*, 85 F.3d, 481, 485 (10th Cir. 1996). Here, Plaintiff has not set forth facts that would establish the named defendants acted with a discriminatory intent, or that would overcome the presumption of reasonableness applied to prison policies. *Cf. Veney*, 293 F.3d at 732. Accordingly, Mr. McIntosh's equal protection claim should be dismissed.

5.      Third Claim - Eighth Amendment

The Eighth Amendment prohibits cruel and unusual "punishments," not cruel and unusual "conditions." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Where an Eighth Amendment claim is based upon conditions of confinement, an inmate must demonstrate that the deprivation suffered was "objectively 'sufficiently serious,'" and that the defendant had a "sufficiently culpable state of mind" or was "deliberately indifferent" to the inmate's health or safety. *Id.* at 834, quoting *Wilson v. Seiter*, 501 U.S. 294, 302-303 (1991). Deliberate indifference requires a higher degree of fault than negligence or even gross negligence. *Berry v.*

*City of Muskogee, Oklahoma*, 900 F.2d 1489, 1495-96 (10th Cir. 1990).  A defendant acts with

deliberate indifference if his or her conduct "disregards a known or obvious risk that is very

likely to result in the violation of a prisoner's constitutional rights."  *Id*. at 1496.  The Supreme

Court explained the test for deliberate indifference:

> We hold . . . that a prison official cannot be found liable under the Eighth Amendment for
> denying an inmate humane conditions of confinement unless the official knows of and
> disregards an excessive risk to inmate health or safety; the official must both be aware of
> facts from which the inference could be drawn that a substantial risk of serious harm
> exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837.  *See also Barrie v. Grand County, Utah*, 119 F.3d 862, 869 (10th Cir.

1997).  "To be guilty of deliberate indifference, the defendant must know he is creating a

substantial risk of bodily harm."  *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997)

(internal quotation marks and citation omitted).

The Complaint fails to properly allege a violation of the Eighth Amendment based upon

the conditions of Mr. McIntosh's control unit placement.  Conditions of confinement that

constitute cruel and unusual punishment must be measured by evolving standards of decency that

mark the progress of a maturing society.  *Rhodes v. Chapman*, 452 U.S. 337, 346-47 (1981)

(Eighth Amendment violated only when an inmate is deprived of the "minimal civilized measure

of life's necessities").  The Eighth Amendment requires prison officials to "provide humane

conditions of confinement by ensuring inmates receive the basic necessities of adequate food,

clothing, shelter, and medical care."  *Despain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001),

quoting *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998).  *See also Ramos v. Lamm*, 639 F.2d

559, 568 (10th Cir. 1980) ("state must provide . . . reasonably adequate ventilation, sanitation,

bedding, hygienic materials and utilities (i.e., hot and cold water, light, heat, plumbing)");

*Wolfish v. Levi*, 573 F.2d 118, 125 (2d Cir. 1978) ("an institution's obligation under the eighth amendment is at an end if it furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety"); *Finney v. Arkansas Bd. of Corrections*, 505 F.2d 194, 207-08 (8th Cir. 1974) (holding that a prisoner in punitive solitary confinement should not be deprived of "basic necessities including light, heat, ventilation, sanitation, clothing and a proper diet").

The Complaint does not allege a denial of basic necessities, such as food, clothing, shelter or sanitation. Rather, Mr. McIntosh challenges the duration of his control unit placement. Plaintiff has not set forth any conditions of confinement "sufficiently serious" to constitute cruel and unusual punishment, or facts demonstrating that Defendants could have drawn and actually did draw the inference that confinement conditions within the control unit posed a substantial risk of serious harm. The Third Claim should be dismissed pursuant to Rule 12(b)(6).

6.      Fourth Claim - First Amendment Retaliation

Defendants SIA Krist and Captain Krist have moved under Rule 12(b)(6) to dismiss Plaintiff's fourth claim alleging retaliation in violation of the First Amendment. More specifically, Defendants contend that the First Amendment claim does not satisfy the *Iqbal* pleading requirements in the absence of factual allegations demonstrating that Defendants' alleged retaliation was knowingly or causally related to Mr. McIntosh's participation in constitutionally protected activities.

In his opposition brief, Mr. McIntosh explains that the only protected activity underlying the retaliation claim concerns the administrative challenge to his continued control unit classification following his return to ADX in November 2008. Because he was validated as an

Aryan Brotherhood member within ten days after filing his final appeal, Mr. McIntosh concludes

that the "totality of the surrounding circumstances . . . [make] a prima facie showing of

retaliation" against SIA Krist and Captain Krist.  *See* Complaint, at ¶¶ 83 and 90-91.  Plaintiff

states that as a control unit inmate, all of his mail "must go through the SIA office for inspection"

where "Mrs. Krist is the SIA agent in charge."  *See* Opposing Motion to Doc. 66, at ¶ 76.  Mr.

McIntosh then presumes,

> 77.     Krist would have inspected McIntosh's final appeal.  An evidentiary
> hearing would allow those prisoners still in the control unit to verify all mail is
> inspected by SIA Krist.  McIntosh does not have access to these prisoners to ask
> for affidavits.
>
> 78.     Mrs. Krist was the SIA agent in ADX-Max in Nov. 2007 the date a federal
> court ordered the government to turn over a validation package, see Exhibit K
> (page 6 of 6).
>
> 79.     It would be more implausible that the United States attorney or agent
> representative would not have contacted Mrs. Krist to secure a validation, putting
> Mrs. Krist on alert that a validation package did not exist.
>
> *       *       *
>
> 85.     Mrs. Krist, having unlimited access to McIntosh's prison file, knowing
> McIntosh was not AB in 2005, 2207 or 2008 when he returned to the ADX.  It
> was only <u>after</u> McIntosh contested his control unit time that he was validated as a
> gang member.  Whether Mrs. Krist "cooked the books" to convince other
> members of the validation board or whether the validation board conspired with
> Mrs. Krist is a matter for a jury to decide.

*Id.*, at ¶¶ 77-79 and 85 (emphasis in original).

"[G]overnment action which chills constitutionally protected speech or expression

contravenes the First Amendment."  *Wolford v. Lasater*, 78 F.3d 484, 488 (10th Cir. 1996).  *See*

*also Wildberger v. Bracknell*, 869 F.2d 1467, 1468 (11th Cir.1989) (holding that retaliation for

filing lawsuits and administrative grievances "violates both the inmate's right of access to the

courts and the inmate's First Amendment rights"). Prison "officials may not retaliate against or harass an inmate because of the inmate's exercise of his constitutional rights . . . even where the action taken in retaliation would be otherwise permissible." *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998) (internal quotation marks and citation omitted). An inmate can raise a retaliation claim by showing that the defendant's actions had a chilling effect on the inmate's First Amendment right to pursue administrative remedies. *Cf. Bruce v. Ylst,* 351 F.3d 1283, 1288 (9th Cir. 2003). *See also Duncan v. Magelssen*, 2009 WL 712387, *6 (D. Colo. 2009) ("It is well settled that prisoners' filing of grievances is activity protected by the First Amendment").

Nevertheless, "an inmate is not inoculated from the normal conditions of confinement . . . merely because he has engaged in protected activity." *Peterson*, 149 F.3d at 1144. "[A] plaintiff must prove that but for the retaliatory motive, the incidents to which he refers, including the disciplinary action, would not have taken place." *Id.* (internal quotation marks and citation omitted). *See also Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996) (the "ultimate question is whether events would have transpired differently absent the retaliatory motive") (citation omitted).

Thus, to properly assert a First Amendment claim for retaliation, the inmate must allege three elements:

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected activity.

*Allen v. Avance*, 2012 WL 2763508, at *5 (10th Cir. July 10, 2012), quoting *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007). "Mere allegations of constitutional retaliation will

43

not suffice; plaintiffs must rather allege specific facts showing retaliation because of the exercise of the prisoner's constitutional rights." *Frazier v. Dubois*, 922 F.2d 560, 562 n. 1 (10th Cir. 1990). "The inmate must allege more than his personal belief that he is the victim of retaliation." *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999).

Even accepting the well-pled allegations in the Complaint as true and viewing those allegations in the light most favorable to Mr. McIntosh, I conclude that Plaintiff's Fourth Claim does not properly assert a claim against SIA Krist or Captain Krist. Mr. McIntosh was charged in successive indictments with conspiracy and murder in or about 2008. Those indictments described Plaintiff as "an associate of the Aryan Brotherhood and . . . a member of Aryan Brotherhood." Mr. McIntosh further alleges that a validation package substantiating his membership in the Aryan Brotherhood was not produced by the government in connection with those prosecutions, notwithstanding a specific request from his criminal defense counsel and an order issued by the United States District Court for the Southern District of California. *See* Complaint, at ¶¶ 72-74, 77-80. Plaintiff presumes, from those facts, that the government did not have a validation package to produce in 2008. Mr. McIntosh claims that after a further delay of 17 months, he received a validation package within ten days of filling his last appeal challenging his continued status as a control unit inmate. *See Gee v. Pacheco*, 627 F.3d 1178, 1189 (10th Cir. 2010) (submission of an administrative appeal is a constitutionally protected activity. *Cf. Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003) (recognizing that "timing can properly be considered as circumstantial evidence of retaliatory intent").

The remainder of the allegations in support of the Fourth Claim, however, are better described as assumptions or conclusions, rather than "facts." Plaintiff characterizes SIA Krist

and Captain Krist as "validation officials," *see* Complaint, at ¶ 83, and suggests that "SIA Krist,

Captain Krist and other validation officials must initiate an investigation, then must affirm,

concur and approve that McIntosh has met the BOP's criteria to be a validated gang member."

*Id.* at ¶ 70.  The Fourth Claim contends that SIA Krist and Captain Krist "and unnamed

defendants are all personally involved in validating McIntosh as an Aryan Brotherhood gang

member."  *Id*. at ¶ 141.  Plaintiff concedes, however, that he does not know the names of "all the

prison staff involved in a validation process," and presumes that unspecified "validation officials

put together a 'validation package' that includes 'evidence' of one's gang membership."  *See*

Opposing Motion to Doc. 66, at ¶¶ 68 and 71. The Complaint states that unnamed "validation

officials validat[ed] McIntosh as an AB member, in March 2010."  *See* Complaint, at ¶ 90.

  To properly assert a claim under *Bivens*, Mr. McIntosh must set forth sufficient facts to

demonstrate that SIA Krist and/or Captain Krist personally participated in the alleged First

Amendment violation.  *Cf. Persaud v. Doe*, 213 F. App'x 740, 743 (10ᵗʰ Cir. 2007).  *Cf. Matson

v. Kansas*, 2012 WL 28073, at *2 (D. Kan. Jan. 5, 2012) ("An essential element of a civil rights

claim against an individual is that person's direct personal participation in the acts or inactions

upon which the complaint is based.").  There must be an affirmative link between the alleged

constitutional violation and each defendant's participation, control or direction, or failure to

supervise.  *See Butler v. City of Norman*, 992 F.2d 1053, 1055 (10ᵗʰ Cir. 1993).  Here, the

Complaint simply claims that SIA Krist and Captain Krist were validation officials.  There are no

factual allegations that demonstrate or even suggest a retaliatory motive on the part of the named

defendants.  Mr. McIntosh is not required to provide "detailed factual allegations" to survive a

motion to dismiss, but he must offer more than speculation and bare conclusions.  *See Ashcroft*,

556 U.S. at 678.

Admittedly, Mr. McIntosh's response brief amplifies on the "facts" that allegedly support his fourth claim.  Plaintiff claims that SIA Krist had access to inmate mail and presumes from that fact that she "would have inspected McIntosh's final appeal."  *See* Opposing Motion to Doc. 66, at ¶ 77.  Plaintiff further believes it would be "implausible" to believe that SIA Krist would not be "on alert that a validation package did not exist" in 2008 when government attorneys were required to produce that material in connection with the pending criminal prosecution.  *Id.* at ¶ 79.  Mr. McIntosh simply presumes that either "Mrs. Krist 'cooked the books' to convince other members of the validation board or . . . the validation board conspired with Mrs. Krist."  *Id.* at ¶ 85.[18]  Notably, Plaintiff's allegations against Captain Krist offer even less substance or factual specificity.

While I am prepared to concede that Mr. McIntosh's proffered chronology of events raises questions that might warrant further inquiry, the Fourth Claim as currently drafted does not satisfy prevailing pleading standards.  Accordingly, I recommend that the Fourth Claim be dismissed without prejudice.[19]

7.     Fifth Claim - Due Process

As for Plaintiff's Fifth Claim, SIA Krist and Captain Krist contend that his validation as

---

[18]The Tenth Circuit in *Hayes v. Whitman*, 264 F.3d 1017, 1025 (10th Cir. 2001) acknowledged that "it might be appropriate for a court to consider additional facts or legal theories asserted in a response brief to a motion to dismiss if they were consistent with the facts or legal theories advanced in the complaint."  The assertions in Mr. McIntosh's response brief are more properly described as assumptions, rather than facts, and reflect little more than Plaintiff personal belief on what SIA Krist might have known or done.

[19]Given the pleading deficiencies in the Fourth Claim, the court has no reason to determine whether *Bivens* will support a retaliation claim under the First Amendment.

an Aryan Brotherhood member did not violate either Mr. McIntosh's procedural or substantive

due process rights.   Plaintiff responds that his due process claim is proper given that "[t]he

defendants validated McIntosh as a gang member without giving him a meaningful opportunity

to mitigate any 'evidence' the Defendants consider important, and without "providing

meaningful hearings before or after being validated."   *See* Complaint, at ¶ 156.

As noted previously, to state a viable due process claim, Mr. McIntosh must allege

sufficient facts to demonstrate he was deprived of a protected liberty interest by virtue of his

validation as an Aryan Brotherhood member.   By itself, a gang classification does not trigger any

due process rights.   *See, e.g., Farr v. Rodriguez,* 255 F. App'x 925, 926 (5th Cir. 2007) (holding

that a gang classification, without more, is insufficient to raise a constitutional claim); *Sparks v.

Foster*, 241 F. App'x 467, 471 (10th Cir. 2007) (finding that a state prisoner was not denied

procedural due process under the Fourteenth Amendment because he was classified as a gang

member; held that the plaintiff did not have a liberty interest in a particular classification); *Adams

v. Small*, 2012 WL 296065, at *3 (S.D. Cal. Jan. 31, 2012) ("prisoners have no federal due

process right to a particular gang classification").   *See also Muniz v. Moore*, 375 F. App'x 841,

844 (10th Cir. 2010) (holding that an inmate's incorrect classification failed to state a cognizable

due process claim "because due process generally does not give prisoners rights to particular

classifications").

Mr. McIntosh might have a protected liberty interest under the Due Process Clause if his

validation as an Aryan Brotherhood member also resulted in conditions of confinement which

imposed "atypical and significant hardship[s]. . . in relation to the ordinary incidents of prison

life."   The allegations in the Complaint, however, do not state a cognizable claim under this

alternative theory.  According to the Complaint, Plaintiff's gang validation "carries with it the burden of monthly urine tests [and] multiple breathalyzers," as well "the very real possibility of being caught in an investigative dragnet that will end in conspiracy and/or Rico indictments and possibly . . . the death penalty."  *See* Complaint, at ¶¶ 92 and 93.  Mr. McIntosh further asserts that other unspecified "burdens and hardships also exist" as a result of the gang classification. These allegations, without more, are not sufficient to demonstrate that Plaintiff's classification as an Aryan Brotherhood member has subjected him to "atypical and significant hardship[s]. . . in relation to the ordinary incidents of prison life."  Plaintiff cannot satisfy this pleading requirement by alluding to consequences that are speculative or remote.  *Cf. Aruanno v. Spagnuolo*, 292 F. App'x 184, 186 (3rd Cir. 2008) (noting that the Fifth Amendment protects against "real dangers, not remove and speculative possibilities"), citing *Zicarelli v. New Jersey State Commission of Investigation*, 406 U.S. 472 (1972).  Plaintiff's Fifth Claim should be dismissed for failure to state a cognizable claim for relief.

8.     Qualified Immunity

To the extent that Mr. McIntosh is suing Defendants in their individual capacities, Defendants raise the defense of qualified immunity.  The Supreme Court has recognized a qualified immunity defense for *Bivens* claims against federal officials.  *See Johnson v. Fankell*, 520 U.S. 911, 914 (1997).  Whether Defendants are entitled to qualified immunity is a legal question.  *Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007).

Resolution of a dispositive motion based on qualified immunity involves a two-pronged inquiry.  First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right.  Second, the court must decide whether the right at issue

48

was clearly established at the time of the defendant's alleged misconduct. *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009) (internal quotation marks and citations omitted). "A reviewing court may exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* "Qualified immunity is applicable unless" the plaintiff can satisfy both prongs of the inquiry. *Id.*

As the court has concluded in this Recommendation that Mr. McIntosh has failed to state any claim upon which relief can be granted against them, Defendants in their individual capacities are entitled to qualified immunity from his claims brought pursuant to *Bivens*. *See Wilder*, 490 F .3d at 815 (instructing district court on remand to enter judgment in favor of defendant on basis of qualified immunity, where plaintiff failed to carry his burden to show violation of a constitutional right).

## CONCLUSION

Accordingly, it is RECOMMENDED as follows:

1.     That "Official Capacity Defendants' Motion to Dismiss" (doc. #66) be GRANTED with respect to Plaintiff's claims for declaratory and injunctive, and his claims for compensatory damages. These claims and/or requests for relief should be dismissed with prejudice.

2.     That  "Individual Capacity Defendants' Motion to Dismiss" (doc. #105) be GRANTED. Defendants Lappin, Revell, Sherrod, Murphy, Nelson, Carney, Santiago, Davis, Rau, Adelsberger, and Bozman should be dismissed without prejudice from this action based upon the court's lack of personal jurisdiction over those individuals. All of Plaintiff's claims

against Defendants, R. Davis, Rau, Adelsberger, Bozman, Revell, Sherrod, Murphy, Nelson, Carney, and Santiago, and any claims against Defendants Conley, Davis, Fluck, Nalley, Sproul and Wiley that accrued prior to April 29, 2009, should be dismissed without prejudice in view of the applicable statute of limitations.

       3,     The "Official Capacity Defendants' Motion to Dismiss" and the "Individual Capacity Defendants' Motion to Dismiss" should be GRANTED as to Plaintiff's First, Second, Third, Fourth and Fifth Claims and those claims should be dismissed without prejudice as to all Defendants. While Plaintiff may be granted leave to file an amended complaint within a specified period, Mr. McIntosh should be put on notice that any allegations in an amended complaint must be made in good faith in accordance with Rule 11 of the Federal Rules of Civil Procedure and should correct the pleading deficiencies addressed in this Recommendation.

**Advisement to the Parties**

       Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir.

1996).  Failure to make timely objections may bar *de novo* review by the District Judge of the

Magistrate Judge's proposed findings and recommendations and will result in a waiver of the

right to appeal from a judgment of the district court based on the proposed findings and

recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir.

1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite

the lack of an objection does not preclude application of the "firm waiver rule");  *International*

*Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th

Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant

had waived its right to appeal those portions of the ruling);  *Ayala v. United States*, 980 F.2d

1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to

appeal the Magistrate Judge's ruling).  *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122

(10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

     DATED this 13th day of August, 2012.

               BY THE COURT:


                s/ Craig B. Shaffer
               United States Magistrate Judge